GEORGE BETTS AND ELIZA BETTS, PLAINTIFFS AND APPELLANTS, V. F. L. SIMS, DEFENDANT AND APPELLEE.

1. **Homestead.** The title to a homestead, exempt under the laws of this state to a family consisting of husband and wife, with or without other members, cannot be divested, or incumbered, by deed, unless such deed be executed and acknowledged by both husband and wife. *Aultman & Taylor v. Jenkins,* 19 Neb., 209. *Bonarden v. Kriz,* 13 Id., 121. *Larson v. Butts,* 22 Id., 370.

2. **Estoppel.** Evidence relied on to estop a wife, the second head of a family, to deny the validity of the title of a purchaser of her exempt homestead by conveyances which she did not execute and acknowledge, examined, and *Held,* Insufficient to establish an estoppel.

APPEAL from the district court for Saline county. Heard there before NORVAL, J.

*R. Wheeler* and *Hall & McCulloch*, for appellant.

Homestead: *Swift v. Dewey*, 20 Neb., 107. *Bonarden v. Kriz*, 13 Id., 121. Estoppel does not apply: *Brant v. Virginia Co.*, 93 U. S., 330. *Spencer v. Carr*, 45 N. Y., 406. *Turner v. Ferguson*, 58 Tex., 6. *Young v. Young*, 12 La., 335.

*Hastings & McGintie*, for appellee, cited: *Grant v. Cropsey*, 8 Neb., 208. *Newman v. Mueller*, 16 Id., 523. *Gillespie v. Sawyer*, 15 Id., 536. *Shields v. Lakin*, 21 O. S., 660. Herman on Estoppel, 369. Bigelow on Estoppel, 449. *Overman v. Hathaway*, 29 Kan., 435.

COBB, J.

This was an action in the nature of *quia timet*, brought in the district court of Saline county, by the plaintiffs, for the purpose of removing certain clouds from, and quieting the title in themselves to, a certain quarter section of land in said county. The petition alleges that the said land was entered by their son, William H. Betts, under the homestead laws of the United States, but that before he had perfected his title thereto he died, unmarried, and without issue; that upon his death they entered into the possession of the same, and occupied and improved the same, in full compliance with the laws of the United States, so that on or about the 28th day of March, 1877, a patent duly issued to them as the heirs of said William H. Betts, to and for said land, by the president of the United States; that they continued to reside upon and occupy said land as a homestead under the laws of this state until on or about the month of September, 1881, when they were wrongfully and without process of law ejected therefrom by one Joseph Brown, who claimed title to said land; that on the 29th day of August, 1878, the plaintiff, George, was

induced to execute and deliver to one George W. Bentley a quit-claim deed to said tract of land, without any consideration whatever; that at the time he executed said quit-claim deed he was a married man and the head of a family; that his wife, the said Eliza Betts, was then living with him upon said land, and occupying it jointly with him as a homestead; that she is still living, and that she did not and has not at any time signed or executed said deed, or any deed or conveyance of or to said land; that at the time said George Betts executed said quit-claim deed of said land the value thereof was less than two thousand dollars; that neither of said plaintiffs owned or occupied any other real estate of any kind, etc.; that they continued to reside thereon and at all times occupy the said land after the execution of said quit-claim deed, until the time when they were forcibly ejected therefrom, as before stated; that since the execution of said quit-claim deed, by divers and sundry conveyances from said George W. Bentley, the defendant, F. L. Sims, claims the title to said premises, under and by virtue of the pretended title derived through and under the quit-claim deed to said George W. Bentley, so as aforesaid made and executed, and is now in possession of the said premises, and holds and occupies the same without just title thereto, etc.; that by reason of the execution of the said quit-claim deed by said George Betts, and the execution of the sundry *mesne* conveyances thereunder, all of which conveyances have been filed and recorded upon the deed records of said Saline county, the legal title in and to said land appears upon the records to be vested in the said F. L. Sims, defendant, and thereby a cloud is thrown upon the title of the plaintiffs, which cannot be removed by an action at law, etc.; that said George Betts has duly and lawfully rescinded and disowned the execution of the said quit-claim deed, upon his part, etc., with a prayer for judgment, etc.

The defendant made an amended answer, which is

lengthy and exhaustive, and, as the court in its decree passed on all the issues presented thereby, and as it will be necessary to set out the decree at length in this opinion, the answer, as such, will not be exemplified. The plaintiffs having replied to the answer there was a trial to the court, with findings, and a decree for the defendant.

The plaintiffs bring the cause to this court by appeal; at least that is the supposition, as no petition in error is to be found with the papers, though counsel of either side designate it as a case of error in their briefs. I here copy the decree at length:

"The cause came on for hearing, a jury being waived, and after hearing the evidence and arguments of counsel, and being fully advised in the premises, the court do find on the issues joined in favor of the defendant and against the plaintiffs.

"2. The court further finds that the United States, on the 25th day of July, 1876, issued a patent to the heirs of one William H. Betts, deceased, to the land in controversy, to-wit: The south-east quarter of section 8 of township 8 north of range one east, the final receiver's receipt for said land having been issued July 15, 1876, and at that time the plaintiff, George Betts, was the sole heir of William H. Betts, deceased; that plaintiffs then were, and now are, husband and wife, and from that date until about September, 1880, said plaintiffs resided upon, used, and occupied said land as their homestead.

"3. On the 15th of July, 1876, said plaintiffs mortgaged said real estate to the New England Mortgage Security Company, to secure the sum of $600 borrowed money, with ten per cent interest from date thereof, payable annually, and due July 1, 1881, both plaintiffs signing and acknowledging said mortgage.

"4. That on the first day of October, 1877, said plaintiffs mortgaged said real estate to one R. S. Bentley to secure the sum of $500, borrowed money, with twelve per

cent interest thereon, and due October 1, 1878, both plaint–iffs signing and acknowledging said mortgage.

"5.    On the 29th day of August, 1878, said George Betts, with the knowledge and consent of his wife, Eliza, executed and acknowledged a quit-claim deed to said real estate to one George W. Bentley, which was made without consideration and for the purpose of placing said real estate beyond the reach of the creditors of said George Betts.

"6.    Some time after the last mentioned date, both George and Eliza Betts went to said R. S. Bentley and applied to him to borrow some more money on said land, thus agreeing to procure a deed to be made by said George W. Bentley to said R. S. Bentley to said real estate, as security for said note, and said R. S. Bentley then loaned to plaintiffs on said land about $1,300, a portion of which said sum was applied in payment of the $500 mortgage mentioned in finding 4 hereof.   To secure said sum of $1,300, said plaintiffs caused, requested, and procured said George W. Bentley to convey to said R. S. Bentley said real estate by warranty deed, March 18, 1879, which deed was duly recorded, and in said deed said R. S. Bentley assumed the payments of all liens and encumbrances on or against said land, and at that time said R. S. Bentley gave said Betts a bond for a deed to convey the land back to said Betts on Betts paying said sum of money.

"7.    On the 8th day of March, 1880, said R. S. Bentley entered into a written contract to lease said premises to said George Betts for the period of one year, said lease being signed by said Bentley and Betts, and was duly recorded on the records of Saline county, Nebraska, May 13, 1880, and plaintiffs occupied said premises and paid said Bentley rent as in said lease provided.

"8.    On the 23d day of September, 1880, plaintiffs were indebted to one Joseph Brown for about four years' wages, and as payment therefor both plaintiffs agreed with said

Brown to have said R. S. Bentley and wife convey said real estate to said Brown, the said Brown agreeing to pay off said mortgage given by said plaintiffs to the New England Mortgage Security Company, and also to pay the balance remaining due from the plaintiffs to R. S. Bentley secured by the deed from George W. to R. S. Bentley. On the said 23d day of September, 1880, said Betts surrendered to said Bentley said bond for a deed or defeasance, and by agreement of said Bentley said bond or defeasance was by them destroyed and canceled, and the said R. S. Bentley agreed with the plaintiffs to convey said real estate to said Brown. At the earnest solicitation and request of, and with the full knowledge and consent of, both of said plaintiffs, said R. S. Bentley and his wife conveyed, September 23d, 1880, by warranty deed, said land to said Brown in payment of the indebtedness of plaintiffs to Brown; and that said Brown then borrowed of one Charles Bidleman $1,150, at eight per cent interest, and said Brown executed, acknowledged, and delivered to said Bidleman a mortgage on said land to secure said sum. That said Brown, on said last named date, paid to said R. S. Bentley out of said $1,150, so borrowed as aforesaid, the balance then due said Bentley from Betts, and with the remainder of said $1,150 he then paid off said $600 mortgage given by plaintiffs to the New England Mortgage Security Company. The deed from Bentley and wife to Brown, and the said mortgage from Brown to Bidleman, were each duly recorded in the county clerk's office of said Saline county on September 24, 1880.

"9. The court further finds that said Brown and plaintiffs all resided upon said land from said last named date until sometime during the fall of 1881, when plaintiffs moved off of said land and took up their residence upon their tree claim, which adjoins the land in controversy, and plaintiffs left said Brown in full possession of said real estate under claim of ownership. That said Brown,

either by himself or tenants, remained in full and undisputed possession of said premises, with plaintiffs' knowledge and consent, until Brown conveyed the same to one F. M. Patton, as hereinafter stated. During the summer of 1882, while said Brown was residing in the state of Iowa, letters passed between said plaintiffs and said Brown for the sale of said land by said Brown to plaintiffs, and in one of said letters to plaintiffs Brown proposed to plaintiffs to sell them the said real estate for $2,150.

"10.   That about July, 1880, plaintiffs having full knowledge of the existence of all of the aforementioned conveyances, and with full knowledge of the conveyance from Bentley to Brown, and of the condition of the title to said land, approached said F. M. Patton and informed him that the land in controversy could be purchased of Brown for $2,150, and at this time showed Patton the said letter they had received from Brown, offering to sell them the land for said price; that plaintiffs not having the money to pay for said land, both urged and requested Patton to purchase the same, and both plaintiffs then and there agreed with said Patton to purchase from said Patton a certain portion of said premises in case Patton would buy said land from said Brown, and plaintiffs agreed to pay said Patton the same price per acre for the portion of the land plaintiffs should take, that Patton should pay Brown. It was then agreed between plaintiffs and Patton that he should go to Iowa, where Brown then was, and purchase the whole of the land in controversy and pay him therefor, and that as soon as plaintiffs should get title from the United States to their tree claim, which adjoins the land in controversy, and on which tree claim plaintiffs were then residing, plaintiffs would borrow the money thereon to pay said Patton for the portion of the land in controversy which plaintiffs had agreed to take.

"11.   The court further finds that said Patton, at the

special instance and request of both of said plaintiffs, and in good faith, relying upon the said actions, conduct, and agreement of plaintiffs with him, and believing that Brown had a perfect title to the land in controversy, and that plaintiffs had no interest or claim therein, went to Iowa, where said Brown then was, and purchased the land in controversy, and procured said Brown to make him a deed of general warranty thereto for and in consideration of the sum of $2,150, said Patton paying said Brown then and there in cash $1,000, and assuming the payment of the said $1,150 mortgage given by Brown to Bidleman. The said deed from Brown to Patton was duly recorded September 7, 1882. Afterwards plaintiffs sold their said tree claim to Patton, and as an inducement to make said sale plaintiffs agreed with said Patton if he would purchase their said tree claim they would surrender to him all claims to the land in controversy. Therefore Patton purchased of said plaintiffs their said tree claim for value, and said plaintiffs then moved from said neighborhood in the fall of 1882, and have not resided there since.

"12. The court further finds that said Patton, at the time he purchased the lands in controversy from Brown, and for several years thereafter, had no notice or knowledge that the plaintiffs had or claimed any interest in the said land; that while plaintiffs knew said Patton was going to Iowa to purchase said land from Brown, and while the same was purchased at plaintiff's instance and request, neither of said plaintiffs made any claim to Patton that they had any interest in said land, and made no objections to the regularity or the validity of any of the deeds or conveyances hereinbefore mentioned and described.

"13. The court further finds that said defendant purchased the land in controversy in good faith, for a valuable consideration at the time paid, and without any notice or knowledge that the plaintiffs had or claimed any interest in said land, and that said Patton and his wife conveyed

said lands to the defendant by a deed of general warranty on the 2d day of December, 1882, and that said defendant, about March 8, 1883, as the balance of the consideration of the said purchase from Patton, fully paid the said $1,-150 mortgage given by Brown to Bidleman.

"14.    The court further finds that, at the commencement of this action, the said defendant was and now is in possession of said land, and that plaintiffs have not been in possession thereof since the fall of 1881; that plaintiffs made no claim to the defendant of their having any interest in said land till the commencement of this action.

"15.    The court further finds that said plaintiffs, and each of them, are estopped from alleging that said deed from said Brown to said Patton is not valid, and that said Patton obtained no title thereto, and that said plaintiffs and each of them are wholly estopped from claiming any title, interest, or estate in or to said land or any part thereof; and that said plaintiffs and each of them are estopped from alleging that said defendant is not the owner of said real estate.

"The court further finds that said defendant has a good and indefeasible title in fee simple to said land, and that the title to said land should be quieted in the said defendant.

"It is therefore adjudged and decreed that the defendant, F. L. Sims, has a good and indefeasible title in fee simple to the south-east quarter of section eight, in township eight north of range one east, in Saline county, Nebraska, and that the title to said land is quieted in said defendant, and that he recover his costs."

The plaintiffs excepted.

It will be observed that in the above findings the learned court has not considered the question of homestead.    Under the laws of our state, as applicable to the case, the homestead rights of the family, and especially of Eliza Betts, as the second head of the family, to my mind,

constitutes the controlling question presented by the record, and the trial court having, as it seems to me, ignored that question, it is doubtful if, upon a thorough examination of its findings and decree, they can stand. It is conceded, on all hands, that the plaintiffs, by virtue of the homestead right of the deceased son, under the laws of the United States entered upon the premises in question as early as 1873; that they perfected the settlement and cultivation of the premises, which had been begun in his life-time by their son, so that, in 1877 the land was patented to the heirs at law of William H. Betts, and was thereby the homestead of the plaintiffs, who were living thereon as married persons at the respective dates of the matters and transactions found by the court in the 2d, 3d, 4th, 5th, 6th, 7th, and 8th findings of the decree.

Section 4, chapter 36 of the Compiled Statutes of this state, provides. that, "the homestead of a married person cannot be conveyed or incumbered unless the instrument by which it is conveyed or incumbered is executed and acknowledged by both husband and wife." I do not, therefore, deem it of great importance whether said findings are sustained by the evidence or not, as, were said points ever so clearly established, they would, as I conceive, fall far short of supplying the signature and acknowledgment of Eliza Betts to the deeds therein set forth. As to the remaining findings of the court, they are subject to this observation : the attention of the court seems not to have been called to the allegation of the petition that the plaintiffs were wrongfully and forcibly ejected from the premises by Joseph Brown, which allegation is not directly denied by the amended answer. Facts tending to prove this allegation are sworn to by both of the plaintiffs, and not denied by any testimony offered on the trial. It, therefore, though not found by the trial court, must be taken as a leading fact that the plaintiffs, and especially Eliza Betts, never voluntarily abandoned or left the homestead, but were for-

cibly ejected therefrom. And while it is true that, during the time of the matters and transactions found and referred to in the 9th, 10th, 11th, 12th, and 13th findings, the plaintiffs were not in the enjoyment of the actual possession of the homestead, yet they were invested with all the rights guaranteed to them by the homestead law; and in so far as the court by its 9th finding intended to establish that the plaintiffs moved off from the premises voluntarily, and with consent left Brown in the undisputed possession of the same, such finding is not sustained by the evidence. It appears from the deposition of Joseph Brown, taken by the defendant, and read at the trial, that it was agreed between the parties that he should receive the deed for the land of Bentley to him in full payment for his previous services; that there was no arrangement made for the residence of the plaintiffs or the possession of the place; nothing said about it until about a year afterwards.

In answer to the interrogatory, Who held possession of the place the year following? he answered that he did, but that Mrs. and Mr. Betts lived there, Mr. Betts being absent part of the time in Oregon. In answer to the interrogatory, About when did they leave the place? he answered, a year after the deed was made to him by Bentley, and he further testified:

Q. State whether or not you had any settlement with the plaintiffs at the time, and how was it made?

A. I had a settlement a little while before they left. We tried to make it between ourselves; it was finally left between Mr. Patton and Mr. McKay.

Q. What matters were included in the settlement?

A. All of our former dealings.

Q. Was the settlement made by the two men named accepted by all the parties and carried out?

A. Yes, it was.

Q. Who were the parties to that settlement?

A. Mr. and Mrs. Betts and myself were the parties interested.

Q. Was Mrs. Betts present during the whole transaction?

A. It took some time to make the settlement, and I don't know whether she was there all the time, but she was there at the final agreement.

Q. Was it, or was it not, a part of the final agreement that they were to remove from the place? to which the witness answered, "It was."

It then appears that Patton was in a position to know all of the facts connected with the dealings and relationship between Brown and the plaintiffs; and while it does not appear in evidence that he knew of the actual removal of the plaintiffs from the premises, as testified to by them, his residence in the immediate vicinity, and his participating in arbitrating the difficulties and settlement between them, and his subsequent transaction in respect to the land, leave it scarcely to be doubted that he knew of the facts and circumstances attending their removal from the place. It seems that sometime in the early part of the year 1882 Joseph Brown conveyed the land in question to F. M. Patton, the same person who had acted as one of the arbitrators in the settlement between Brown and the Betts, as stated; and it is claimed by defendant that Eliza Betts took such part in this transaction that she is estopped *in pais* to deny the legality and binding force of the sale and conveyance, or the title derived therefrom by the defendant as Patton's grantee. Brown testifies in answer to the

Q. What did you do with the premises in August, 1882?

A. I deeded them to Patton. I was at that time living in Iowa, and before that had received letters from George Betts, wanting to buy the premises of me. Mr. Patton came to Iowa to see me, and said that Mr. Betts and himself were going to buy the land in dispute, in partnership. Betts was to have the east eighty acres, and Patton the west. Betts and myself agreed upon the price of the land through letters.

12

The witness seeks to connect Eliza Betts with this transaction by the following statement—he says : " I came back to Nebraska with some cattle that Mr. Patton and myself had bought, and asked Mrs. Betts if they had a bond for a deed from Mr. Patton for the east eighty. I had deeded the whole quarter section to Patton. She said they had not. After this I asked Mr. Betts the same question. He said he did not, that he did not know whether he could buy it or not."

The witness stated upon further examination, in reply, as follows :

Q. What, if anything, did Mrs. Betts say about having such an arrangement with Mr. Patton.

A. She said he promised to deed them the east eighty acres at the same price per acre that he paid me for the whole quarter section.

Q. Did Mr. Patton. have. any writings from them, or either of them, when he came to you in Iowa ?

A. Yes, he had a bill against me from Mrs. Betts that he tried to put in as part payment on the land.

Q. In whose writing was the bill, and for what amount ?

A. In Mrs. Betts' writing, and for twenty or thirty dollars.

Q. Did you have any conversation with Mrs. Betts afterwards about it ?

A. I asked her what she sent it for ; she said I owed her that much ; I told her I had paid them all up on our last settlement.

Francis M. Patton, for defendant, after stating that he was acquainted with the plaintiffs, and with Joseph Brown, and that he at one time held a deed for the land in question, was further examined as a witness, as follows :

Q. How did you come to get that deed ?

A. At the time I had Mrs. Betts' timber claim rented, Brown had the place ; the year before Betts had moved

off; Betts got a letter from Brown in Iowa; Betts had written to him to know what he would take for the place, and he brought it out to where I was ploughing and showed it to me, and he wanted we should buy that place, and we would take the place subject to the mortgage. I thought about it some ; he said he could get it for $2,150.   Brown wrote the terms in a letter.   I thought I would take one-half of it, and he wanted to drop down to a certain row of trees.   I don't know how much there was of it, but I should judge, probably, fifty acres.   I never measured it.

Q.  · Did you see Mr. and Mrs. Betts before you went?

A.   I went down and had a talk with Mrs. Betts about going to buy this land of Joe Brown, and she agreed that she would take from that row of trees, east, and that it was to be deeded to her individually.   I agreed with the old man, first, and agreed with her second, and I went on and bought it, and told Brown, at the time, that I was buying it for the old folks and me.

Q.   Did she know, at that time, that Brown held the title to the land?

A.   She did.

Q.   Did she make any claim, at that time, that she had any claim on the land?

A.   She did not.

Q.   Were they living on or occupying it as a homestead?

A.   They were not living on the homestead, but had moved off the fall before, and this was in July.

Q.   Did she say anything about not having signed the deed, or mortgage, or anything.

A.   She said she had not signed a mortgage, I think it was, that she had not signed some paper, but that it would have to go now.   She wanted two or three rods north of the trees, so as to keep them clear off.

Q.   Did she give you an order, or anything of that kind?

A.   She sent a bill, or order, or account, that amounted to some thirty odd dollars, by me to present to Joe, and collect it for her, and if anything was paid to her on that, it was to go on the land.

Q.   Was there any written contract, between you and her, with regard to that matter?

A.   I think there was. I know if there was not that Mrs. Betts wanted one and spoke about having one.

It is not contended by the defendant, nor could it be, under the facts of the case, that Patton was deceived or misled by anything said to him by Mrs. Betts; he knew, as I conclude from all the facts and circumstances in the case, that the premises in dispute were at one time, and up to the fall before, the homestead of the plaintiffs; and that they had been forcibly ejected therefrom. As a proposed purchaser of the land from Joseph Brown he was charged with notice of Brown's title, as it appeared in the public records. It is presumed that he examined these records and knew their condition; that the homestead title to the land was still in Eliza Betts. In addition to this he stated in his evidence, above quoted, that she told him that she had not signed some papers, but that now she supposed it would have to go. This was notice sufficient to put him upon an inquiry, which, if followed up by an examination of the records, would have led to the knowledge of Brown's want of title, had he not known it before.

The homestead law is of comparative recent date. Many of its provisions have not heretofore been construed to their legal conclusion. I know of no case in which the precise question here presented has been considered; and I am without the citation to any case involving the right of homestead claimants, in the brief of either counsel. We are cited to many cases in which the doctrine of estoppel is discussed, and to some wherein married women residing with their husbands have been by their conduct estopped to deny the validity of conveyances and contracts involv-

ing their dower interests in lands, deeds for which they had not executed and acknowledged in accordance with law. I am not prepared, nor do the exigencies of the case require it, to lay down the rule that no conduct or declarations of a married woman, the second head of a family, will estop her to deny the validity of a deed not signed or acknowledged by her, and by which the family homestead is sought to be invaded; but I do say that, with my present views of the law, and the true construction of the statutes, it would require a very strong case, far stronger than the one at bar, to superinduce that conclusion. Herman, in his Commentaries on the Law of Estoppel, to which we are cited by counsel for defendant, says, at Sec. 5, p. 3, vol. 1: " Where one, by his words or conduct, willfully causes another to believe in the existence of a certain state of things, and induces him to act on that belief, or to alter his own previous position, the former is estopped from averring against the latter a different state of things as existing at the same time. By the term willfully, it must be understood, if not that the party represents that to be true which he knows to be untrue, at least, that he means that his representation is to be relied and acted upon accordingly; yet generally without regard to intention, if the party so conducts himself as to deceive a reasonable man to his prejudice, he will be estopped from asserting the truth. Thus where an action is brought for the conversion of a policy of insurance, and the plaintiff proves that he has given instructions to the defendant to effect a policy for him, and gives in evidence a letter from the defendant to the plaintiff, stating that he had effected the policy, the defendant is not allowed to contradict his own representation, and show that no policy had been effected; he is held liable as an insurer for the amount that would have been recoverable by the plaintiff on the policy if it had been duly effected."

Can it be possible, upon the facts and evidence of the

case, that it will be seriously contended that Patton was induced by anything that this elderly lady, over 80 years of age, said or failed to say to him to move in so doubtful a manner in so dubious a transaction—was her words the moving cause and inducement to go to the state of Iowa, to his old acquaintance for whom he had acted as arbitrator in the settlement mentioned, and make the purchase of the land in question? I cannot believe it; we think it is not to be credited.

The author quoted states the law of estoppel at Sec. 949, Vol. II., as follows: "One essential element of every equitable estoppel, by which a man is to be precluded from claiming what is his own, is ignorance on the part of the purchaser or party claiming the benefit of estoppel, as to the true state of the title. To estop the vendor of real estate, by statements in regard to the effect of his deed or extent of the grant, such ignorance on the part of the purchaser must concur with knowledge of his title, and willful concealment or misrepresentation in regard to it on the part of the vendor, or such gross negligence or indifference to the rights of others as, under the circumstances, to be equivalent to actual and premeditated fraud. It must also appear that the language or conduct of such vendor was the direct inducement to the purchase by the other party, and that the purchaser will suffer if the vendor is permitted to deny it. Where one, who by settlement had acquired a right of pre-emption, promised a party, who was about purchasing the section pre-empted, that he would not assert his claim, it was *held*, that he was estopped thereby from applying for a certificate from the land office."

Upon the principle here laid down we would be required to believe that the knowledge of the old woman concerning her homestead rights concurred with the ignorance of Patton of everything connected with the title to the land and the acts and doings of Betts and Brown during the

past few years, with all of which we have seen he had opportunity of knowledge.

Again, in order to apply the doctrine of estoppel, under the above rule, it must appear that he was solely and directly induced to make the purchase by her representations. That Patton was so influenced, or his conduct controlled in this purchase in any degree by the acts, sayings, or doings of this octogenarian grandmother, is not to be believed, nor to be seriously entertained.

It may be conceded that George Betts would be estopped, as well by his conduct as by his deed, to deny the title of the defendant, but it is the peculiarity of the homestead law that a part of, or interest in, the exempt homestead will not pass or be created unless the deed for that purpose be signed and acknowledged by both husband and wife in any case where the family consists of husband and wife with or without other members ; so that, even George Betts is not estopped to deny the defendant's title, notwithstanding his deed and inculpatory conduct, so long as the deed remains unsigned and unacknowledged by Eliza Betts. Defendant, in brief of counsel, contends that the form of action used will not lie in the present case, where the plaintiffs are out of possession, unless they have the legal title to the land. In support of this they cite numerous authorities, including one of our own cases. To this proposition and argument there are two serious objections.

First. The plaintiffs are possessed of the legal title, as we have seen, the U. S. land patent runs to the heirs of William H. Betts, deceased ; George Betts is conceded to be his sole heir at law, and Eliza is the wife of George and the mother of the deceased. By occupation and claim the premises became their homestead under the laws of this state. We have seen what has been attempted to divest them of the title.

Second. The statute, Sec. 57, Chap. 73, provides that, " an action may be brought and prosecuted to final

judgment, decree, or order by any person or persons, whether in actual possession or not, claiming title to real estate against any person or persons who claim an adverse estate or interest therein for the purpose of determining such estate or interest and quieting the title to said real estate."

The constitutionality of this provision of the statute is not questioned in this proceeding, nor has it been heretofore disputed. Its terms are too plain to require to be construed. It is contended that the defendant being in possession, this is a contest of legal titles, and that an action of ejectment should have been brought rather than an action to quiet title; that a court of equity will not try adverse claims to titles to land, which are wholly legal, and award the recovery of possession. To this is answered that the district court is a court of law and equity; it adjudicates in but one form of action in civil cases. A suitor in certain kinds of action, for the redress of certain grievances, or where the defence consists in the allegation and proof of a certain class of facts, is by the constitution guaranteed the right of trial by jury. A denial of this right would be ground for reversal of the judgment of the court. It is not doubted that the case at bar is within that class of actions. The pleadings contain all the essential allegations for the recovery of real estate, and the essential elements of the action formerly known as ejectment. Its object is to remove the cloud over the title of plaintiffs to the real estate in question by reason of the attempted conveyance of George Betts to the Bentleys, and the subsequent conveyances by them to Brown and Patton, as well as to regain the possession of the homestead now withheld from them by defendant. Doubtless this was a proper case for a jury, and had either party demanded that it be tried to a jury, it can scarcely be conceived that any court would have denied that right. If such denial had been made it would have been corrected in

this court. No such demand was made in the court below, and the right of a party thereto, after having chosen another method, in the same tribunal, cannot now be considered.

The judgment of the district court is reversed, and a decree will be entered in this court quieting the plaintiffs' title in the premises, and awarding the possession thereof to them in accordance with the prayer of the petition.

DECREE ACCORDINGLY.

THE other judges concur.